# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 11-22055-CIV-ROSENBAUM

SHIPCO TRANSPORT, INC.,

                    Plaintiff,

v.

ABBA SHIPPING LINES, INC., *et al.*,

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This cause is before the Court upon the bench trial held in this case. *See* D.E. 90, D.E. 98. Following trial, the parties submitted their Stipulation of Proposed Agreed Findings of Fact [D.E. 103]. In addition, on October 19 and 26, 2012, Plaintiff and Defendants each filed their own Proposed Findings of Fact and Proposed Conclusions of Law. *See* D.E. 104, D.E. 105, D.E. 106. Pursuant to the requirements of Rule 52 of the Federal Rules of Civil Procedure, the Court now issues the following Findings of Fact and Conclusions of Law.

### *I.  Background*

This case arises out of a dispute over the transportation of certain cargo by Plaintiff Shipco Transport, Inc. ("Shipco"), in connection with arrangements that Defendant Abba Shipping Lines, Inc. ("Abba"), made with Shipco to transport the cargo from Nashiville, Tennessee, overland to Savannah, Georgia, and then by sea to Tin Can Island in Nigeria. *See* D.E. 1 at ¶ 11. When the cargo arrived at Tin Can Island, the Nigerian Customs Service refused to allow it to be discharged because no Form M import license number had first been obtained for the cargo. *See id.* at ¶ 17. Under Nigerian law, the cargo was considered to constitute electronic waste and was not permitted

without a Form M import license.  *See id.* at ¶ 18.  Therefore, the cargo had to be returned to the United States and disposed of in accordance with United States law and Environmental Protection Agency ("EPA") regulations pertaining to electronic waste.  *See id.* at ¶ 20.

Shipco sued Abba and Ullico Casualty Company ("Ullico"), which had issued a bond to Abba, effectively guaranteeing that it would pay any judgment or settlement arising out of Abba's transportation-related activities up to the amount of $75,000.00.  *See* D.E. 1; *see also id.* at ¶¶ 9-10. In its Complaint, Shipco asserts a claim for breach of contract (regarding the bill of lading) against Abba and a bond claim against Ullico.  *See* D.E. 1.  Defendants, in turn, deny responsibility for the charges that Shipco incurred, contending instead that any damages that Shipco suffered resulted solely from Shipco's own actions and inactions.  *See* D.E. 15 at ¶ 30.  Thus, trial in this action centered on which party was responsible for the alleged damages that Shipco experienced.

The Court held a bench trial over two days.  *See* D.E. 90, D.E. 98.  During the bench trial, the Court heard testimony from Joye Hansen, Klaus Lysdal, and Donna Travano.  In addition, the parties submitted the deposition transcripts of Joye Hansen, Klaus Lysdal, Donna Travano, and Anna Strawman,[1] which the Court has reviewed. The following exhibits were admitted into evidence: Plaintiff's Exhibits ("PX") 1 through 35, Defense Exhibits ("DX") A through H, and a letter decision dated July 26, 2012, from the United States Customs and Border Protection Service.

---

[1]These deposition transcripts were apparently filed for impeachment purposes, and the parties separately designated portions of Strawman's deposition as trial testimony.  The Court considered all materials submitted.

## *II.  Findings of Fact*[2]

### *A.  The Parties and Jurisdiction*

1.  This is a civil case in admiralty or maritime jurisdiction within the meaning of 28 U.S.C. § 1333(1).  D.E. 103 at ¶ 1.

2.  Plaintiff Shipco raises admiralty and maritime claims within the meaning of Rule 9(h), Fed. R. Civ. P.  D.E. 103 at ¶ 2.

3.  Shipco is a corporation organized and existing under the laws of New Jersey, with its office and principal place of business at 80 Washington Street, Hoboken, New Jersey.  D.E. 103 at ¶ 3.

4.  Shipco carries on business as a non-vessel operating common carrier licensed by the Federal Maritime Commission.  D.E. 103 at ¶ 4.

5.  Defendant Abba is a corporation organized and existing under the laws of Florida.  D.E. 103 at ¶ 5.

6.  Abba also carries on business as a non-vessel operating common carrier licensed by the Federal Maritime Commission.  D.E. 103 at ¶ 6.

7.  Defendant Ullico is a corporation organized and existing under the laws of Delaware, with its office and principal place of business at 1625 I Street, NW, Washington, DC.  D.E. 103 at ¶ 7.

8.  Ullico is an insurance company licensed to issue $75,000 surety bonds to non-vessel operating common carriers who, like Abba, are located in Florida.  D.E. 103 at ¶ 8.

---

[2]To the extent that any of these Findings of Fact constitute conclusions of law, they are adopted as such.

9.  On October 27, 2009, Ullico, as surety, issued Ocean Transportation Intermediary Bond No. JGINVOCC1942 on Form FMC-48, pursuant to 46 U.S.C. § 40902, naming Abba as the bond principal (the "Bond").  D.E. 103 at ¶ 9.

10.  Through the Bond, Ullico undertook to pay any judgment or settlement arising out of Abba's transportation-related activities, up to the amount of $75,000.  Judgment creditors and settlement creditors relating to this activities for which the Bond was issued are explicitly described in the Bond as beneficiaries of the Bond.  D.E. 103 at ¶ 10.

*B.  The Shipping Incident*

11.  On about June 20, 2010, Abba, as shipper, booked certain cargoes with Shipco, as carrier, for carriage from Nashville, Tennessee, overland to Savannah, Georgia, and then by sea to Tin Can Island in Nigeria, via the transshipment port of Tarragona, Spain.  D.E. 103 at ¶ 11.

12.  Shipco issued a booking note in confirmation, and the booking note incorporated Shipco's standard bill-of-lading terms and conditions, which the booking note identified as being available online.  D.E. 103 at ¶ 12.  The booking confirmation further contained a description of the three containers that Abba sought to ship as "used televisions."  PX 5; PX 6.  Under "special conditions," the booking confirmation noted, "Waiver/Form M (import license no.) must be mentioned on HBL.  PX 6.  Finally, the booking confirmation set forth an estimated shipping date of August 20, 2010, from Savannah, Georgia, to Tin Can Island, with arrival at Tin Can Island estimated for September 25, 2010.  *Id.*

13.  On about August 20, 2010, pursuant to the booking, Shipco issued a written bill of lading contract of carriage, identified as No. TCS9884518 (the "Bill of Lading"), for three shipper-packed cargo-shipping containers, the contents of which Abba described as "CRT TELEVISION

SETS" (the "Cargoes").  The Bill of Lading was issued by Shipco and was freely accepted, without

objection, by Abba.  D.E. 103 at ¶ 13.

14.   The terms and conditions of carriage were set out on the reverse side of the Bill of

Lading and are the same standard terms and conditions published by Shipco in accordance with 46

U.S.C. § 40501(b)(5).  Among those terms and conditions are the following:

| | | |
|---|---|---|
| 1. | DEFINITIONS | |
| | Carrier: | [M]eans the Company stated on the front of this Bill of Lading as being the Carrier and on whose behalf this Bill of Lading has been signed. |
| | Charges: | Means freight and all expenses and money obligations incurred and payable by the Merchant. |
| | * * * * * | |
| | Freight: | Means all of the following relating to or in connection with the Goods: ocean freight and other charges provided by the Carrier's applicable tariff, including but not limited to . . . expenses arising or incurred under this Bill of Lading; additional freight or other charges; . . . return freight if the Goods are returned. |
| | * * * * * | |
| | Merchant: | Means the shipper . . . or any person acting on behalf of any of the above mentioned persons. |
| | * * * * * | |
| 2. | CARRIER'S TARIFF | |
| | The provisions of the Carrier's applicable tariff, are incorporated herein. . . . | |
| 3. | WARRANTY | |
| | The Merchant warrants that in agreeing to the terms hereof he is or is the agent of and has the authority of the person owing | |

or entitled to the possession of the Goods or any person who
has a present or future interest in the Goods. . . .

* * * * *

5.    CERTAIN RIGHTS AND IMMUNITIES FOR THE
      CARRIER AND OTHER PERSONS
      (1)    The carrier shall be entitled to sub-contract on any
             terms the whole or any part of the carriage.

* * * * *

9.    MERCHANT'S RESPONSIBILITY
      (1)    The description and particulars of the Goods set out
             on the face hereof are furnished by the Merchant and
             the Merchant warrants to the Carrier that the
             description and particulars including, but not limited
             to, of weight, content, measure, quantity, quality,
             condition, marks, numbers and value are correct.

      (2)    The Merchant shall comply with all applicable laws,
             regulations and requirements of customs, ports and
             other authorities and shall bear and pay all duties,
             taxes, fines, imposts expenses and losses incurred or
             suffered by reason thereof or by reason of any illegal,
             incorrect or insufficient marking, numbering or
             addressing of the Goods.

* * * * *

      (4)    No Goods which are or may become dangerous,
             inflammable or damaging or which are or may
             become liable to damage any property or person
             whatsoever shall be tendered to the Carrier for
             Carriage without the Carrier's express consent in
             writing and without the Container or other covering in
             which the Goods are to be transported and the Goods
             being distinctly marked on the outside so as to
             indicate the nature and character of any such articles
             and so as to comply with all applicable laws,
             regulations and requirements. If any such articles are
             delivered to the Carrier without such written consent
             and marking or if in the opinion of the Carrier the
             articles are or are liable to become of a dangerous,
             inflammable or damaging nature, the same may at
             any time be destroyed, disposed of, abandoned, or

-6-

rendered harmless without compensation to the Merchant and without prejudice to the Carrier's right to Charges.

(5) The Merchant shall be liable for the loss, damage, contamination, soiling, detention or demurrage before, during and after the Carriage of property (including, but not limited to, Containers) of the Carrier or any person or vessel (other than the Merchant) referred to in 5(2) above caused by the Merchant or any person acting on his behalf or for which the Merchant is otherwise responsible.

(6) The Merchant shall defend, indemnify and hold harmless the Carrier against any loss damage, claim, liability or expense whatsoever arising from any breach of the provisions of this clause 9 or from any cause in connection with the Goods for which the Carrier is not responsible.

19. CHARGES

(1) Charges shall be deemed fully earned on receipt of the Goods by the Carrier and shall be paid and non-returnable in any event, whether vessel, inland carrier and/or cargo lost or not lost. . . .

\* \* \* \* \*

(3) All Charges shall be paid without any set off, counterclaim, deduction or stay of execution.

\* \* \* \* \*

(5) Should the Merchant fail to make timely payment of the applicable Freight, the Merchant shall be liable to Carrier for all costs and expenses including attorneys' fees associated with the collection of such Freight from the Merchant plus 6% of interest calculated from the date the Freight became due.

\* \* \* \* \*

D.E. 103 at ¶ 14; *see also* PX 4.

15.   Under Clause 5(1) of the Bill of Lading terms and conditions, Shipco subcontracted the ocean carriage part of the carriage to vessel-operating common carrier Zim Integrated Shipping Services Ltd., doing business as Zim Lines ("Zim").  D.E. 103 at ¶ 15.

16.   Between June 22, 2010, when the Cargoes were booked, and August 20, 2010, when the Bill of Lading issued, several events regarding the Cargoes transpired.  At some point, the United States Customs and Border Protection ("CBP") contacted Shipco and spoke with Anna Strawman to advise Shipco that a CBP hold had been placed on the Cargoes.  Strawman Deposition ("Dep.") at 11:7 - :22.

17.   Strawman, in turn, had discussions with Donna Travano of Abba regarding the CBP hold and Travano's efforts to resolve it.  Strawman Dep. at 13:10 - :16.

18.   On August 2, 2010, Travano inquired of Strawman, "Would you please let us know the status of the containers that were retained by the Port in Savannah[?]" PX 28.

19.   Also on August 2, 2010, Strawman responded to Travano's inquiry:

> Zim has advised that [C]ustoms still has two of the three containers on hold.  They may be waiting on further documentation from you so please follow up.  Customs would not Advise Zim what they were waiting for.  Containers ZCSU8239202 and ZCSU8239769 are on hold.
>
> Zim has advised that the container ZCSU8197344 is off hold.  They are asking permission to split the booking and ship the one container separately.  Please advise if you would prefer this or you wish them to all ship together.
>
> Thank you.

PX 28.

20.   On August 9, 2010, David M Otakie of CBP had a conversation with Donna Travano of Abba in which he advised Travano that the three containers, which Abba had arranged to have

transported by Shipco, had been "rejected for EXPORT" because "[t]he appropriate EPA paperwork ha[d] not been filed for this shipment."  PX 23.  Otakie further directed Travano and Abba that "[t]hese containers need to be picked up from the Georgia Ports Authority Terminal in Garden City[,] [Georgia], ASAP."  *Id.*  On August 13, 2010, Otakie sent Travano and Abba an email in which he confirmed this conversation that he had had with Travano on August 9, 2010.  *Id.*

21.  On August 10, 2010, Anna Strawman of Shipco emailed Travano, inquiring, "Please advise regarding this booking this morning.  Please advise if you want this split or if this is not shipping at all or if you need all three containers on the same vessel."  DX A at 0087.

22.  Neither Travano nor anyone else from Abba informed Shipco that on August 9, 2010, CBP had instructed Abba to remove the Cargoes from the Georgia Ports Authority Terminal "ASAP."

23.  Instead, on August 10, 2010, Travano emailed Strawman and stated,

> The U.S. Customs officer called us today and stated since containers have been loaded with used TVs, they need to have an EPA permit.
>
> We have contacted the EPA office relating to this issue and they will be contacting the shipper in order for them to obtain that permit.  We have also send [sic] an email to shipper requesting them to contact the EPA.  As soon as we have news from the EPA, we will let you know for the loading of the ship.
>
> In the meantime, we do not think it is a good idea to ship one container that also requires that permit.

PX 26.

24.  In response, Strawman emailed back, "Does this mean that this shipment will sail as hazardous?"  DX A at 0090.

25. Later on August 10, 2010, Travano again e-mailed Strawman, opining, "I do not believe it is dangerous to the ship's safety.  That would be to the environment.  In any case, we have to wait

for the assessment of the EPA.  EPA should be getting in touch to [sic] Shipper (we gave them their

whole info).  We also sent message to Shipper the [sic] contact the EPA."  PX 27.

26.  On August 13, 2010, Travano received an email from Maggie Hwang, who worked on

behalf of Triplex Investment Holding (the customer on whose behalf Abba was shipping the three

containers to Tin Can Island, Nigeria), in which Hwang asked Travano to contact CBP and advise it

that the shipper was preparing the paperwork with EPA.   As Hwang explained it, the EPA

"mentioned that [the shipper had] not file[d] the EPA [paperwork] yet, so that [was] the reason why

[CBP] asked [the shipper] to unload."  PX 30 at UL00005.

27.  Travano responded to Hwang in another email dated August 13, 2010, in which she

requested, "As soon as you finish filling out the paper, please email to [CBP] cc'ing to us.  So we

can follow up with all parties concerned at [CBP]."  PX 30 at 1.

28.  Hwang then replied in another email dated August 13, 2010, in which she asked

Travano to email her "the vendor's information (the loading site)" and to let her know, in addition to

other information, all points of entry to and departure from each foreign country through which the

cathode ray tubes (Cargoes) would pass.  PX 30 at 1.

29.  After receiving Hwang's inquiry, on August 13, 2010, Travano emailed Shipco,

> Would you please answer to the below question raised by the EPA to
> the Exporter:
>
> "(H) The name of any transit country through which the CRTs
> [cathode ray tubes] will be sent and a description of the approximate
> length of time the CRTs will remain in such country and the nature of
> their handling while there."
>
> Your prompt attention will be appreciated as the container [sic] are
> being held by U.S. Customs.

PX 29 at UL00012.

30.  Klaus Lysdal of Shipco responded to Travano's August 13, 2010, email the same day, explaining, "We have reached out to carrier to get these things clarified.  Hope to have an answer for you Monday."  PX 29 at UL00011.

31.  Meanwhile, on August 13, 2010, Lysdal emailed Zim, stating, "Got a bunch of questions from our customer [Abba] who is trying to resolved [sic] the [CBP] hold. . . [dots in original].  Can you someone [sic] go over below and us the answers for these, so we can hopefully get this released and moving[?] Would you please answer to the below question raised by the EPA to the Exporter . . . ."  The email then essentially repeats Travano's questions in her August 13, 2010, email to Shipco.  DX A at 0097.

32.  On August 16, 2010, Travano again emailed Lysdal, asking "Any news yet from SSL [steamship line (Zim)?]  Info on the transshipments is urgently needed by shipper so that they may submit docs to EPA and the containers be loaded on the next vessel."  PX 29.

33.  That same day, Strawman emailed Zim, requesting, "Can you please advise or at least let us know if you are checking into it?"  DX B at 0102.

34.  Also on August 16, 2010, Lysdal sent an email to other Shipco employees and to Zim, asking "Any news?  It's been a full day and we are under pressure from US Customs to get this done . . . . . . [dots in original] Don't want [C]argo[es] to roll again if."  DX A at 0096.

35.  On August 17, 2010, after Zim sent Shipco the transport details for the Cargoes, Strawman asked Zim, "Can you please advise if this has been released from [CBP's] hold?"  DX B at 0101.

36.  A Zim employee answered, "I'm still checking, Brandi is out of the office[.] I will definitely will [sic] know first thing in the morning."  DX B at 0100.

37.    On August 17, 2010, Strawman responded to Abba on behalf of Shipco, emailing Travano, "Booking is on the Zim Ontario, 5/E schedule to sail out of SAV 8/20 and will arrive at transshipment port Tarragona, Spain estimated arrival 9/2 and depart Tarragona 9/15 and schedule to arrive final destination Tin Can Islan[d] 9/26. . . ."  PX 31.

38.  On August 18, 2010, Zim emailed Strawman, "All cntrs have been released from [CBP] hold and will sail on intended vessel."  DX B at 0099.

39.  The Cargoes were loaded aboard the Zim vessel and exported on August 20, 2010.  D.E. 103 at ¶ 21.

40.  Despite receiving Strawman's August 17, 2010, email informing Abba that the Cargoes were booked to sail on August 20, 2010, neither Travano nor anyone else from Abba emailed Shipco back to instruct Shipco not to load the Cargoes.

41.    Travano testified that she had approximately six telephone conversations with Strawman and other Shipco customer service employees between the booking of the Cargoes in June 2010 and the loading of the Cargoes.  *See, e.g.*, Travano Deposition ("Dep.") at 84:3 - :6; *see also* D.E. 99 at 15:18 - :24; *id.* at 16:9 - :12; *id.* at 47:11 - :15.   During those telephone conversations, Travano testified, Strawman and the other Shipco employees repeatedly asked Strawman whether the Cargoes could be shipped, and Travano instructed them that they could not because the Cargoes had been detained by CBP and that CBP had instructed Travano that the containers required EPA permits to be shipped.  *Id.* at 81:13 - 83:5.  While the Court concludes that Travano did, in fact, have telephone conversations with Strawman and possibly other Shipco

employees,[3] for the following reasons, the Court does not find Travano's testimony to be dependable regarding the precise contents of those discussions:

    a.  Travano herself impugned her memory and concentration abilities, stating, "I hardly remember what I did yesterday," and agreeing that as she sat for her January 20, 2012, deposition, it was "hard to say what happened five months ago."  Travano Dep. at 79:13 - :19.  She further stated during her trial testimony, "I'm sorry, I don't remember.  Much of the things, I'm seventy-four years old.  Sometimes I forget.  I'm sorry.  I don't remember, I don't remember."  D.E. 99 at 18:15 - :17.  In addition, Travano testified that she has "a very small attention span."  *Id.* at 45:14 - :16.

    b.  Travano has also demonstrated her apparent confusion regarding what transpired between Abba and Shipco in relation to the shipping of the Cargoes.

        1.  Travano insisted that the Cargoes were loaded and sailed before August 13, 2010, Travano Dep. at 33:3 - 34:6, and that after she learned that the Cargoes had already shipped, she spoke for the first time with Lysdal.  *Id.* at 37:9 - :25; 85:1 - :7; 92:10 - :16.  But she also testified that she called Lysdal in response to the August 17, 2010, email that she received from Strawman, stating that the containers were scheduled to ship on August 20, 2010 — obviously, before the Cargoes actually shipped.  *See id.* at 36:1 - 37:25; *id.* at 92:10 - :16.  Travano further explained that in further response to the August

---

    [3]Although Travano stated during her deposition that she spoke by telephone with Srawman and other Shipco employees about not shipping the Cargoes, during her trial testimony, Travano testified that "all along, Anna Strawman was the only person that I dealt with."  D.E. 99 at 33:17 - :24.

17, 2010, email from Strawman, she provided Lysdal with Triplex's telephone number and address so that Lysdal could get in contact with the shipper regarding the EPA permit. *Id.* at 37:22 - 39:19. A review of the email record, however, demonstrates that Travano did not advise Shipco — and specifically, Joye Hansen (and later, Lysdal) — of Triplex's contact information until at least October 5, 2010, approximately six weeks after the Cargoes had already left Savannah. *See* PX 34 at 4; PX 24.

2. Travano testified that she specifically told Strawman not to load the Cargoes by email on August 10, 2010, referring to the email described above in paragraph 23 of these Findings of Fact and Conclusions of Law. Travano Dep. at 28:5 - :23. In fact, however, although Travano advised Strawman about the problem with the EPA in that email and opined that it was not a "good idea" to ship one of the containers, a reading of the email reveals that she did not "specifically [tell] . . . Strawman . . . not to load the containers."

3. Travano testified that she had a telephone conversation with Strawman on about August 13, 2010, in which Travano informed Strawman that she was going to retrieve the Cargoes, and Strawman told her that the Cargoes had already been shipped. Travano Dep. at 27:15 - 28:4; 100:2 - 101:19. In fact, however, the emails between Travano and Shipco employees show that on August 17, 2010, Strawman advised Travano that the Cargoes were scheduled to sail out of Savannah on August 20, 2010. PX 31.

4. Although Travano stated during her deposition that she spoke by telephone with Srawman and other Shipco employees about not shipping the

Cargoes, during her trial testimony, Travano testified that "all along, Anna Strawman was the only person that I dealt with."  D.E. 99 at 33:17 - :24.

c.   Strawman, who has not been employed by Shipco since February 2012 and therefore has little, if any, apparent continuing personal interest in the outcome of this litigation, testified that although she recalled having telephone conversations about obtaining a release of the CBP hold on the Cargoes, she did not remember any telephone discussions with Travano about the EPA issues.  Strawman Dep. at 19:7 - 20:24.

42.   On August 26, 2010, Travano requested by email that Shipco send her a copy of the bill of lading relating to Abba's June 22, 2010, booking confirmation.  PX 32 at UL00028.  Travano asked for the bill of lading because she wanted to send it to Triplex.  Travano Dep. at 49:9 - 50:23. In general, when Abba arranged for the shipment of cargo, it issued an invoice and the bill of lading to its customer once the cargo was onboard the ship.  *Id.* at 45:23 - 47:8.  It did so with the expectation of being paid at that point.  *Id.* at 47:1 - :8.

43.   Kristen Lane of Shipco responded on August 30, 2010, attaching an invoice and a copy of Zim's invoice and bill of lading.  PX 32 at UL00028.

44.   On September 16, 2010, Travano wrote to Hwang, informing her that "[t]he shipping company is insisting that we pay for the freight and the additional charges.  Please respond to this email as soon as possible regarding payment."  PX 33 at UL00034.

45.   Hwang responded later that same day, "Our consignee insist to pay the freight as COLLECT.  Please kindly discuss with ZIM Line about it."  PX 33 at UL00033.

46.   Travano then replied to Hwang on September 16, 2010,

Unfortunately, shipping company insists in [sic] freight to be prepaid.

-15-

As a matter of fact, they wanted payment before shipped [sic] sailed due to the nature of the cargo.  I believe I mentioned that to you.

Due to the above, containers were put on hold at destination until freight is paid.  I would advise your consignee that they pay in advance[;] otherwise they would not be able to retrieve the cargo from the port as soon as the ship arrives.  If containers are not released from the port soon, more charges at the Nigeria [sic] will arise.  That is the case not only in Nigeria, but in many countries of the world.

PX 33 at UL00033.

47.  On September 21, 2010, Travano followed up with Hwang, asking whether she had news on the payment.  PX 33 at UL00032.

48.  Hwang answered Travano on September 21, 2010, emailing her, "Please realized [sic] that the material is a donation which is free, the Nigeria [sic] is just only paying the shipment cost, so they insist to pay the ocean freight at the destination.  Please allow them to pay the cost at the destination."  PX 33 at UL00032.

49.  Travano then asked Hwang, "What about the charges originated here in the U.S.[?] Who is going to pay[?]" PX 33 at 1.

50.  Hwang responded to Travano, simply, "The Nigeria."  PX 33 at 1.

51.  On October 5, 2010, Travano again wrote to Hwang, this time complaining, "You are delaying the payments of the ocean freight and the other related charges which are your responsibility.  We need to resolve this matter.  Please send us your payment as soon as possible." PX 34 at 4 - UL00042.

52.  In response, on October 5, 2010, Hwang answered,

Please inform the ZIM in Nigeria immediately since the consignee is willing to pay at the destination.  Our company has no money to pay. If the ZIM did not agree the payment as collect, then we have no choice but abandon the cargo.  We are a small company, we cannot

-16-

afford any loss, our company is closing down the business now.  I am looking for new job right now. . . .

PX 34 at 4.

53.  Travano then wrote an email to Joye Hansen of Shipco, in which she explained,

When they called us first, they asked for a quote for 3 containers for used furniture.  A few days later they've asked for a quote for 3 containers for CRT monitors.  When I called the warehouse to find out what kind of cargo they were loading on the container, they confirmed that they were CRT monitors.

That company is not registered with the State of California, Department of Corporation, I have found in the Internet the following information:

Triplex Investment Holding . . .

I have called that number and no one answers the phone.

I have another contact number . . . .  That number also rings but no one answers either.

PX 34 at 4.

54.  On October 13, 2010, Travano emailed Lysdal of Shipco, stating,

I have spoken with Inspector . . . [O]takie . . . .  He assures us that they inspected the three containers and found cargo to be TV monitors with toxic material and when they closed them, they had put new seals.  They did not authorize the exportation of those containers . . . .

The AES/SED was definitely filed as CRT TELEVISION SETS.

The application by Okinawa for Triplex clearly indicates that it is the same company (documents were sent to you on a previous email).  Triplex is most probably the aka name.

PX 24.

55.  As required by the Bill of Lading and noted earlier, the Cargoes were loaded aboard the

*M/V Zim Ontario* at the Port of Savannah and carried to the transshipment Port of Tarragona, where

the Cargoes were transferred and loaded aboard the Zim vessel *Vera D* and carried to Tin Can Island, Nigeria.  There, the Nigerian Customs Service refused to allow the Cargoes to be discharged due to a failure to present a "Form M" import license number to Nigerian Customs.  D.E. 103 at ¶ 16.

56.  Under Nigerian law, Abba's Cargoes were considered to be electronic waste, and their attempted importation into Nigeria without the necessary preshipment inspection, "Form M" import license number, and documentation amounted to a violation of Nigerian anti-dumping laws.  D.E. 103 at ¶ 17.

57.  Because importation into Nigeria was refused, the Cargoes had to be returned to the United States and disposed of in accordance with United States law and EPA regulations dealing with electronic waste.  D.E. 103 at ¶ 18.

58.  As a result of incident discussed above, Shipco has suffered the following losses:

| | | |
|---|---|---|
| (A) | $17,380.00 | Ocean freight from Savannah to Tin Can Island |
| (B) | $8,400.00 | Ocean freight to return the Cargoes to Savannah |
| (C) | $600.00 | Drayage from the Port of Savannah to a warehouse |
| (D) | $2,400.00 | Devanning the Cargoes and reloading them into recycling containers |
| (E) | $41,761.20 | Disposal of the Cargoes |
| | $70,541.20 | TOTAL |

D.E. 103 at ¶ 19.

59.  Upon demand, Abba has paid no part of the total losses incurred by Shipco.  D.E. 103 at ¶ 20.

60.   Travano did not order the return of the Cargoes when they were en route to the transshipment Port of Tarragona, while they were at Tarragona, or when they were loaded and en route to Tin Can Island.  D.E. 103 at ¶ 22.

### III.  Conclusions of Law[4]

"What we've got here is failure to communicate."
— The Captain, *Cool Hand Luke*

The Court's review of the documents and testimony in this case reveals an essential miscommunication at the heart of this dispute:  although the Cargoes could not be shipped without incident until both the CBP hold and the EPA issue had been favorably resolved, Shipco was under the impression that release of the CBP hold addressed any other obstacles to shipping, including any EPA issue.  The question here is who is responsible for this false impression — Shipco or Abba?

Federal courts enjoy primary jurisdiction over maritime issues.  *Misener Marine Constr., Inc. v. Norfolk Dredging Co.*, 594 F.3d 832, 837 (11ᵗʰ Cir. 2010).  A contract falls within maritime jurisdiction when "the substance of the contract at issue in the dispute — without regard to the identity of the parties — is reasonably necessary to the conduct of maritime commerce."  *Id.* (citation and internal quotation marks omitted).  A bill of lading constitutes a contractual agreement between a shipper and a carrier.  *Crowley Am. Transp., Inc. v. Richard Sewing Mach. Co.*, 172 F.3d 781, 783 n.2 (11ᵗʰ Cir. 1999) (citation omitted).  As such, it represents the essence of maritime commerce and therefore falls within maritime jurisdiction.

To state a cause of action for breach of contract, a party must demonstrate the existence of a valid contract, a material breach of that contract, and damages.  *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11ᵗʰ Cir. 1999).  Here, there is no controversy that a valid contract in the form of

---

[4]To the extent that any Conclusions of Law constitute findings of fact, they are adopted as such.

the Bill of Lading exists.  Nor is there any question that damages were incurred by Shipco.  Instead, the only real issue concerns whether Abba materially breached the Bill of Lading.

Shipco asserts that Abba did so by failing to obtain the necessary preshipment inspection for the Cargoes, the Form M import license number, and other necessary documentation for importation into Nigeria.  *See* D.E. 1 at ¶ 25.  In addition, Shipco complains that Abba materially breached the Bill of Lading by refusing to pay the charges that Shipco incurred in shipping, returning, and disposing of the Cargoes.  *Id.*  Ullico retorts that Abba did not breach the Bill of Lading, but, rather, Shipco loaded and shipped the Cargoes without Abba's authorization and, in fact, directly contrary to Abba's instructions.

To resolve this issue, the Court reviews the evidence.  First, the parties appear to be in agreement that the Cargoes would not have been refused admission to Nigeria, had the proper EPA permits been obtained.  What is less clear is why the Cargoes were shipped in the absence of this required documentation.  This Court concludes that the Cargoes were loaded and shipped to Nigeria without the proper paperwork as a result of Abba's shortfalls.

It is true that on August 10, 2010, Travano discouraged Shipco from sending the one container for which the CBP hold had been lifted because that container still lacked an EPA permit and that she followed up that same day, advising Shipco that "we have to wait for the assessment of the EPA."  PX 26; PX 27.  But neither Travano nor anyone else working on behalf of Abba advised Shipco that the day before that, CBP had instructed Abba to remove all three containers from the Port "ASAP."  PX 23.  Had Abba either removed the containers as instructed by CBP on August 9, 2010, or informed Shipco that CBP had ordered the Cargoes removed, the Cargoes would not have been present to have been shipped eleven days later.

Exacerbating the situation, Travano then emailed Shipco three days later with several questions, explaining, "Your prompt attention will be appreciated as the container [sic] are being held by U.S. Customs." PX 29 at UL00012.  This email stated nothing about the continued EPA problem and implicitly suggested that the only remaining issue concerned the CBP hold on the Cargoes.  And the record demonstrates that Shipco understood this email to mean precisely what the email implied.  In this regard, the same day that Shipco received Travano's email, Shipco emailed Zim, stating, "Got a bunch of questions from our customer [Abba] who is trying to resolved [sic] the [CBP] hold . . . ."  DX A at 0097.

Nor did Abba's August 16, 2010, email to Shipco clarify the situation.  In that email, Abba asked, "Any news yet from SSL [steamship line (Zim)?]  Info on the transshipments is urgently needed by shipper so that they may submit docs to EPA and the containers be loaded on the next vessel." PX 29.  While Abba's August 16 email expressly mentioned the EPA issue, it tied the EPA issue to the information that Abba sought from Shipco in the August 13 email, which, as noted above, explained that the information was necessary to obtain CBP's release of its hold on the Cargoes.  In other words, Abba's August 16 email furthered the incorrect impression that CBP would release its hold on the Cargoes only when the EPA issue had been resolved.  Making matters worse, Abba's August 16 email also tied resolution of the EPA issue, and thus, the CBP hold, to allowing the Cargoes to "be loaded on the next vessel."

The very next day, on August 17, 2010, Shipco emailed Abba, "Booking is on the Zim Ontario, 5/E schedule to sail out of SAV 8/20 and will arrive at transshipment port Tarragona, Spain estimated arrival 9/2 and depart Tarragona 9/15 and schedule to arrive final destination Tin Can Islan[d] 9/26. . . ."  PX 31.  Clearly, Shipco alerted Abba that the "next vessel" was due to leave on

August 20 and that the Cargoes were booked aboard it.  But still Abba did nothing to prevent the loading of the Cargoes three days later, two days after CBP had released its hold.

To the contrary, it appears that Abba may have also been under the impression at the time that the Cargoes sailed on August 20, 2010, that all issues had been resolved, since the next email did not occur until August 26, 2010, when Abba requested a copy of the Bill of Lading to bill Triplex.  Abba billed its customers with the expectation of being paid.  Had Abba been under the impression in late August or early September when it billed Triplex that Shipco had shipped the Cargoes in violation of Abba's instructions not to do so, it seems likely that Abba would have protested the charges with Shipco instead of billing them to Triplex.  But Abba did not do that.  To the contrary, Abba suggested to Triplex in writing that it was Triplex's fault that the Cargoes were refused in Nigeria and that additional charges were incurred.  *See* PX 33 at UL00033 ("As a matter of fact, [Shipco] wanted payment before shipped [sic] sailed due to the nature of the cargo.  I believe I mentioned that to you.  Due to the above, containers were put on hold at destination until freight is paid.  I would advise your consignee that they pay in advance[;] otherwise they would not be able to retrieve the cargo from the port as soon as the ship arrives.  If containers are not released from the port soon, more charges at the Nigeria [sic] will arise.  That is the case not only in Nigeria, but in many countries of the world").   PX 33 at UL00033.  Indeed, as of October 5, 2010, Abba specifically described the charges incurred in this case as Triplex's "responsibility."  *See* PX 34 at 4 - UL00042 ("You are delaying the payments of the ocean freight and the other related charges which are your responsibility.  We need to resolve this matter.  Please send us your payment as soon as possible." ).

The problem for Abba (and ultimately, for Ullico) arises from the fact that Triplex's failure to obtain the necessary documentation and to pay the charges becomes Abba's failure under the Bill

of Lading.  The Bill of Lading defines the "Merchant" as "the shipper . . . or any person acting on behalf of any of the above mentioned persons."  Thus, under the terms of the Bill of Lading, Abba was the "merchant," regardless of the fact that it was acting on behalf of Triplex.

As the "merchant," Abba bore the responsibility under the Bill of Lading to "comply with all applicable laws, regulations and requirements of customs, ports and other authorities and [to] bear and pay all duties, taxes, fines, imposts expenses and losses incurred or suffered by reason thereof or by reason of any illegal, incorrect or insufficient marking, numbering or addressing of the Goods." PX 5 at ¶ 9.(2).  Thus, it was Abba's duty — not Shipco's — to ensure that the proper EPA permit and Form M had been timely obtained or to prevent the Cargoes from being shipped — either by removing them from the port when expressly instructed to do so eleven days before they were shipped, or by specifically and clearly instructing Shipco not to load the Cargoes.  Abba did neither of these things and, therefore, is liable under the Bill of Lading for the costs incurred as a result of the shipping, return, and disposal of the Cargoes.  PX 5 at ¶ 9.(5) and (6).

Under the Bill of Lading, Shipco is also entitled to its reasonable attorney's fees incurred and interest at a rate of 6% calculated from the date the Freight became due.  Ordinarily, in the United States the prevailing party in litigation may not collect its attorney's fees from the losing party.  *Aleyska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 247 (1975).  Under this so-called "American Rule," each party, including the prevailing party, must bear its own fees. *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dept. of Health & Human Resources*, 532 U.S. 598, 602 (2001).  As applicable to the Court's analysis in the instant case, an exception to the American Rule exists where the parties have entered into an enforceable contract that authorizes an award of fees.  *Aleyska Pipeline Serv. Co.*, 421 U.S. at 257; *see also Crowley Am. Transp.*, 172 F.3d at 785-86.  The Bill of Lading in this case expressly provides, "Should the Merchant fail to make timely

payment of the applicable Freight, the Merchant shall be liable to Carrier for all costs and expenses including attorneys' fees associated with the collection of such Freight from the Merchant plus 6% of interest calculated from the date the Freight became due." PX 4 at ¶ 19.(5). Because Abba did not make timely payment under the Bill of Lading, Shipco is entitled to receive, in addition to payment for all damages, reasonable attorney's fees and 6% interest.

### *IV.  Final Conclusions*

Based on the foregoing Findings of Fact and Conclusions of Law, it is hereby **ORDERED AND ADJUDGED** as follows:

1.  Plaintiff Shipco is entitled to judgment in its favor and against Defendants Abba and Ullico;

2.  Plaintiff Shipco is entitled to $70,541.20, plus contractual attorney's fees, costs, and contractual 6% interest calculated from the date the Freight became due, from Abba.

3.  Of this amount, Plaintiff Shipco is entitled to $70,541.20, plus contractual attorney's fees, costs, and contractual 6% interest calculated from the date the Freight became due, up to $75,000.00, from Ullico, as Abba's insurer.

4.  The Court retains jurisdiction over attorney's fees and costs associated with the instant case, for which Plaintiff may file a separate motion in accordance with Local Rule 7.3, S.D. Fla.

5.  Final Judgment will be entered by separate order, in accordance with Rule 58, Fed. R. Civ. P.

**DONE AND ORDERED** at Fort Lauderdale, Florida, this 27th day of December 2012.

_____
ROBIN S. ROSENBAUM
UNITED STATES MAGISTRATE JUDGE

-24-

cc:    Counsel of Record